Wal-Mart Stores, Inc. ("Wal-Mart"), appeals from a judgment awarding Dianne Gardner workers' compensation benefits. We reverse and remand.
Both parties agree that on September 17, 1999, Gardner, an employee of Wal-Mart, sustained an injury to her left foot while working at a Wal-Mart store hanging purses on a rack. The parties stipulated to all issues except the percentage of Gardner's disability and whether her injury was limited to the schedule in § 25-5-57(a)(3)a.14.
Gardner received treatment from several physicians after the injury. A bone scan taken on October 1, 1999, revealed a possible fracture of Gardner's left foot. Dr. William Krauss prescribed a CAM walking boot to be worn at all times and advised Gardner not to work until her next bone scan. A second bone scan was taken on October 13, 1999; this scan was "essentially negative," and Dr. Krauss released Gardner to return to work at full capacity. Gardner continued to experience pain in her foot and after seeing a couple of other physicians, she was referred to Dr. David Moorthi, a pain-management specialist. During Gardner's first visit to Dr. Moorthi on December 22, 1999, he diagnosed her with Reflex Sympathetic Dystrophy ("RSD"); however, in a subsequent visit on January 21, 2000, Dr. Moorthi changed his diagnosis to arthritis because the treatments he prescribed did not improve Gardner's condition. Dr. Moorthi acknowledged in his deposition testimony that Gardner seemed to experience "some severe pain" at times. (Plaintiff's exhibit 1, p. 51).
Gardner saw Dr. Wesley Spruell on February 18, 2000. Dr. Spruell found Gardner to be inconsistent in her presentation and her answers regarding her condition. Dr. Krauss continued to see Gardner as well and, in a visit to him on April 5, 2000, Dr. Krauss noted Dr. Spruell's findings and concluded, based on his own evaluation, *Page 170 
that Gardner had "no objective symptoms or signs" of a problem, but that she walked with a cane. (Defendant's exhibit 3). Dr. Krauss stated that he felt there was nothing more that he could do for Gardner and determined that his opinion she had reached maximum medical improvement. Id. However, he arranged for a Functional Capacities Evaluation ("FCE") to be administered by Andy McGill, a physical therapist, at Tuscaloosa Therapy.
Based on the FCE test results, McGill assigned Gardner a 13% impairment to her left foot, a 9% impairment to the left lower extremity, and a 4% impairment to the body as a whole. (Defendant's exhibit 1, p. 39). Using the American Medical Association's Guides to the Evaluation of Permanent Impairment, and based on Gardner's feedback, McGill gave Gardner a pain rating of 5 on a scale of 1 to 5, with a 5 being the worst pain level. McGill found that Gardner presented signs of inconsistent physical effort throughout the evaluation and recommended that she undergo another FCE, but Gardner refused.
After looking at the results of the FCE, Dr. Krauss, on May 8, 2000, rated the impairment of her lower extremity to be 14% and her impairment to the body as a whole to be 6%. (Defendant's exhibit 3). Dr. Krauss stated that he felt Gardner was "able to complete a light physical demand level"; he encouraged her to discontinue using the CAM walking boot, but noted that he found it appropriate that she continue to use the cane. Id.
Gardner was first cleared to return to work three days after her accident, and, aside from a two-month period during which she received medical treatment and recovered disability benefits, she has worked at Wal-Mart since that time. Currently, Gardner is a fitting-room associate and her duties include sitting in the fitting room, answering phones, and opening fitting-room doors for customers when necessary. The parties agree that Gardner earns more now than she did before the accident.
Gardner testified at trial that she endures severe pain due to her injury, rating it at an 8 out of 10, with 10 being the worst pain, and she complained that the pain was constant. She testified that she can stand only for five minutes at a time and can sit for only 30 minutes at a time. She claims that she can no longer sing in her church's choir because of the standing required and she testified about a cruise she went on to the Bahamas in 2001 on which she had to have the special accommodation of a wheelchair to be able to able to get around the ship. Gardner also testified that she sometimes has a friend drive her to work, and that she has a nurse come to her home to cook and clean for her because she cannot do those things on her own.
Gardner filed her complaint for workers' compensation benefits against Wal-Mart in the Marengo Circuit Court. The trial court received both oral and written evidence at the trial on June 12, 2002. The trial court entered its judgment, finding in favor of Gardner, on December 6, 2002.
Section 25-5-57(a)(3)i., Ala. Code 1975, commonly referred to as the "return-to-work" provision of the Workers' Compensation Act, provides, with certain exceptions, that
 "[i]f, on or after the date of maximum medical improvement, except for scheduled injuries as provided in Section 25-5-57(a)(3), an injured worker returns to work at a wage equal to or greater than the worker's pre-injury wage, the worker's permanent partial disability rating shall be equal to his or her physical impairment and the court shall not consider any evidence of vocational disability. *Page 171 
In its judgment, the trial court evinced concern with the applicability of the Act's return-to-work provision:
 "It is the conclusion and finding of this Court, after having observed [Gardner], her demeanor, and heard her testimony under oath, that she has suffered a 90% physical impairment as a consequence of this accident. The case is governed by § 25-5-57(a)(3)(i) of the Alabama Code. That Code section states that a worker's permanent partial disability rating shall be equal to his or her physical impairment and the Court shall not consider any evidence of vocational disability. The Court has not considered any vocational evidence and has not considered [Gardner's] age, education, training, or work experience."
(C. 33).In explaining its award of a 90% physical impairment, the trial court observed that
 "[t]his Court is not bound by the physician's medical impairment rating. Compass Bank v. Glidewell, 685 So.2d 739 (Ala.Civ.App. 1996). It is the duty of this Court to determine the extent of disability suffered by [Gardner] as a result of her job injuries and in making this determination all evidence has been considered, including the Court's personal observations and interpretation of the evidence as presented."
(C. 33).
The trial court awarded Gardner $21,046.61 in accrued benefits and approximately $124 per week for approximately 148 weeks in future benefits. Wal-Mart appeals, contending that the physical impairment rating is not supported by substantial evidence and that the trial court improperly went outside the schedule set forth in § 25-5-57(a)(3)a., Ala. Code 1975, in its award of benefits.
The percentage of Gardner's physical impairment with which the trial court concerned itself is only relevant if Gardner's claim for compensation is not governed by reference to the schedule set out in § 25-5-57(a)(3)a. Section 25-5-57(a)(3)a. provides, in part:
 "For permanent partial disability, the compensation shall be based upon the extent of the disability. In cases included in the following schedule, the compensation shall be 66 2/3 percent of the average weekly earnings, during the number of weeks set out in the following schedule:
". . . .
"14. For the loss of a foot, 139 weeks.
". . . .
"16. For the loss of a leg, 200 weeks."
Further, § 25-5-57(a)(3)d., Ala. Code 1975, provides:
 "Loss of Use of Member. — The permanent and total loss of the use of a member shall be considered as equivalent to the loss of that member, but in such cases the compensation specified in the schedule for such injury shall be in lieu of all other compensation, except as otherwise provided herein. For permanent disability due to injury to a member resulting in less than total loss of use of the member not otherwise compensated in this schedule, compensation shall be paid at the prescribed rate during that part of the time specified in the schedule for the total loss or total loss of use of the respective member which the extent of the injury to the member bears to its total loss."
The proper application of § 25-5-57(a)(3)a. and d. was addressed by our Supreme Court in Ex parte Drummond Co., 837 So.2d 831
(Ala. 2002), in which, among other things, the Court noted: *Page 172 
"In Bell v. Driskill, 282 Ala. 640, 213 So.2d 806 (1968), this Court established an exception that removes certain injuries from the workers' compensation schedule. This Court held inBell:
 "`[A]lthough the injury itself is to only one part or member of the body, if the effect of such injury extends to other parts of the body, and produces a greater or more prolonged incapacity than that which naturally results from the specific injury, or the injury causes an abnormal and unusual incapacity with respect to the member, then the employee is not limited in his recovery under the [Workers'] Compensation Law to the amount allowed under the schedule for injury to the one member.'
". . . .
 ". . . Specifically, the Bell test permitted an injury to a scheduled member to be compensated outside the schedule if the effect of the injury extends to other parts of the body and produces a greater or more prolonged incapacity than that which naturally results from the injury to the specific member."
837 So.2d at 833-34 (emphasis in original) (citations omitted). The Court then renewed its commitment "to the policy that underlay the Bell test." 837 So.2d at 834. Quoting 4 Lex K. Larson, Larson's Workers' Compensation Law § 87.02 (2001), the Supreme Court concluded:
 "`The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.'"
 "(Footnote omitted.) This language remains unchanged from the edition of the Larson treatise on which this Court relied in Bell. Because of the confusion that has developed surrounding the Bell test, we today adopt the language recited above from Larson, Workers' Compensation Law § 87.02, as the test for determining whether an injury to a scheduled member should be treated as unscheduled."
Drummond Co., 837 So.2d at 834-35.
The trial court's judgment contains no mention of the so-called "Bell test" or the rule articulated by our Supreme Court inDrummond Co.; there is no determination of the applicability of the provisions of § 25-5-57(a)(3)a. and d. It is not the role of this court to make the findings contemplated by Drummond Co., or by those statutory provisions; that is the task of the trial court. Ex parte R.T.S., 771 So.2d 475, 477 (Ala. 2000). Accordingly, the trial court's judgment is reversed, and the cause is remanded for the trial court to enter a judgment consistent with this opinion and with the holding of our Supreme Court in Drummond Co.
REVERSED AND REMANDED.
YATES, P.J., and CRAWLEY and THOMPSON, JJ., concur.
PITTMAN, J., concurs in the result, without writing.